JOSEPH V. EDESKUTY &
ASSOCIATES, Plaintiff,

v.

JACKSONVILLE KRAFT PAPER CO.,
INC., Defendant.

No. CIVIL 4–87–613.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 30, 1988.

Linda L. Holstein, Raymond M. Oeschler, Opperman & Paquin, Minneapolis, Minn., for plaintiff.

George G. Eck, Amy J. Ihlan, Raymond A. Hayward, Dorsey & Whitney, Minneapolis, Minn., for defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on plaintiff's motion for partial summary judgment

and defendant's motion to dismiss for lack of personal jurisdiction or, in the alternative, for improper venue. The Court finds that defendant waived its personal jurisdiction defense, determines that venue is proper and will grant plaintiff's motion for partial summary judgment.

FACTS

Plaintiff Joseph V. Edeskuty & Associates (Edeskuty) is a Minnesota sole proprietorship which provides engineering and design consulting services. Edeskuty filed this action on July 9, 1987 against three defendants seeking compensation for consulting work performed at a paper mill and power plant in Jacksonville, Florida. Two of the defendants, Abraham Zion and Seminole Kraft Paper Co., were dismissed from this suit for lack of personal jurisdiction. Defendant Jacksonville Kraft Paper Co., Inc. (Kraft), a Florida corporation, which operated the paper mill and power plant until October 31, 1986, is the only remaining defendant.

This suit had its genesis in October 1983 when Kraft contacted Edeskuty and orally requested engineering services at the Jacksonville paper mill and power plant. Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment, Exhibit A,[1] Affidavit of Robert V. Edeskuty at par. 3 and attachment. After performing initial consulting services, Edeskuty submitted an invoice in the amount of $9,280.71 to Kraft's pulp and power manager, Evan M. Wise. Plaintiff's Exhibit B, December 6, 1983 Letter from Robert V. Edeskuty to Evan M. Wise. Along with the invoice, Edeskuty submitted a proposal for further services in the amount of $13,219. Plaintiff's Exhibit C, Proposal for Study of Alternative for Short Term Reduction of Dependence on Fuel Oil at 4. In response, Kraft stated that it would issue a purchase order for Edeskuty's completed work and take Edeskuty's proposal under advisement. Plaintiff's Exhibit D, December 8, 1983 Letter from Evan M. Wise to Robert V. Edeskuty.

In January 1984 Kraft authorized payment for Edeskuty's earlier proposal.

Plaintiff's Exhibit E, January 25, 1984 Kraft Change Order. Soon afterward, Edeskuty began performing work for Kraft based solely on oral authorizations because Kraft's business "was such that great flexibility was required from engineers to quickly solve or analyze problems that cannot be anticipated." Plaintiff's Exhibit G, Affidavit of Evan M. Wise at par. 6.

From February 1984 through March 1985 Edeskuty billed Kraft in excess of $150,000 for professional services. Plaintiff's Exhibit H, Account with Jacksonville Kraft Paper Co., Inc. 12/05/83—4/08/85. Examples of Edeskuty's work for Jacksonville include:

1) On-site studies and recommendations for reducing Kraft's dependence on oil;

2) Feasibility study and preliminary engineering work on converting oil-fired boilers to burn pulverized dried bark;

3) Feasibility study of replacing high pressure drop emission control scrubbers with low pressure drop scrubbers;

4) Consulting and design improvements to paper machine lump crusher roll shaft;

5) Repeated meetings with Jacksonville executives and Florida State environmental officials to discuss Jacksonville's on-going efforts to comply with pollution emission standards; and

6) Consulting and evaluation on freeze up problems at plant due to plant shutdown.

See Outline of services attached to Plaintiff's Exhibit A, Edeskuty Affidavit as well as Plaintiff's Exhibit G, Wise Affidavit.

Edeskuty claims that its work during this time was authorized by a number of Kraft officers, including Kraft's president, Ben Westby, its executive vice president and general manager, Ronald G. Caravano, and its pulp and power manager, Evan M. Wise. Edeskuty also claims that Kraft paid Edeskuty without ever requiring written approval or authorization. Kraft's account was paid in full for services invoiced

---

1. These exhibits are hereinafter cited as Plaintiff's Exhibits.

through March 14, 1985. *See* Plaintiff's Exhibit H, Account with Jacksonville Kraft Paper Co., Inc., 12/5/83—4/8/85.

In early March 1985 Kraft was acquired by Abraham Zion. Edward Sadowsky replaced Ben Westby as president within a few weeks of the company's sale. Deposition of Abraham Zion at 86. Financial problems forced a shutdown of half the mill and power plant three months after it was purchased and the facility closed completely two months later. Zion Dep. at 85–88.

Edeskuty continued to perform work for Kraft until December 4, 1985. *See,* Plaintiff's Exhibit N, Invoice for services from November 1, 1985 through December 4, 1985.[2] Kraft made partial payments for this work with the last payment received by Edeskuty on September 6, 1985.[3]

In October 1985 Zion assumed the duties of president in order to dissolve the company. Zion Dep. at 93. At some point thereafter a creditor committee was elected in order to permit Kraft the time needed to either sell or liquidate. Zion Dep. at 92. When Edeskuty failed to receive any further payments by January 1986, it secured a mechanic's lien against Kraft in the amount of $83,110.64. Complaint, Exhibit E. On October 31, 1986 Kraft sold the Jacksonville paper mill and related assets to Seminole Kraft Paper Co. Zion Dep. at 103. As part of the sale agreement, Kraft placed $12 million into an escrow account to satisfy the various default judgments and liens which had been obtained by Kraft's creditors for nonpayment of bills. All creditors except for Edeskuty satisfied their claims from the escrow account.[4] Zion Dep. at 121–22. After unsuccessfully attempting to collect its debt from Semi-

nole and its parent corporation plaintiff instituted this action.

Advancing contract and *quantum meruit* theories, Edeskuty claims $83,065.64 for work performed for Kraft. Edeskuty's complaint also asserts claims for conversion, fraud, fraudulent inducement to contract, and punitive damages against Kraft.

## DISCUSSION

Two motions are before the Court. Kraft moves for dismissal on the basis of a lack of personal jurisdiction or, in the alternative, for improper venue. Edeskuty responds to Kraft's motion with a request for sanctions under 28 U.S.C. § 1927. Edeskuty also moves for summary judgment on its contract and *quantum meruit* claims.

### I. *Personal Jurisdiction*

#### A. *Factual Background*

Some of the history of this litigation is relevant to the question of whether the Court has personal jurisdiction over Kraft.

Three months after this case was filed, in October 1987, the two defendants other than Kraft moved to dismiss for lack of personal jurisdiction. Kraft moved for a transfer of venue but did not move to dismiss for lack of personal jurisdiction. At oral argument, the Court asked counsel for Kraft[5] why it had not done so.

> THE COURT: Why haven't you brought a motion for lack of personal jurisdiction for Jacksonville Kraft?
>
> MR. CAMBRONNE: Because, Your Honor, the Jacksonville Kraft Paper Company apparently did have some business relationship that extended a number of years before my clients were ever involved with the company. To the extent that there is a bill owing, Your Hon-

---

2. Each invoice stated that 1.5 percent interest per month would be charged to accounts more than 30 days old.

3. *See,* Plaintiff's Exhibit N, dated December 4, 1985 Summary of Invoices, Payments and Amounts Due. The exhibit lists a payment on September 23, 1985, but that payment was actually received on August 23, 1985. This discrepancy in the records is discussed *infra* at page 749.

4. Apparently, plaintiff's lien was not included on the list of judgments and liens to be paid. Zion Dep. at 109, 122.

5. At the October 6, 1987 hearing, Kraft was represented by Karl Cambronne of Chestnut & Brooks. Cambronne also represented Abraham Zion. *See* October 6, 1987 hearing transcript at 3. George Eck, current legal counsel for Kraft, was present at that hearing as counsel for Seminole Kraft Paper Co. *Id.*

or, it's a bill owing relating to the Jacksonville Kraft Paper Company.

I don't know at this juncture, Your Honor, other than from what the Complaint indicates, that all the services provided by the Edeskuty company were provided in the state of Florida. I think there may be a viable cause of action relating to the corporate Defendant Jacksonville Kraft Paper Company. But as the moving papers indicate, that case is appropriately resolved in the state of Florida and not here.

Now, there is a horse of a different color when we are talking about the individual Defendant, Your Honor. Mr. Abraham Zion—

THE COURT: Let's stick to the corporate defendant. *Are you saying that you believe that there is personal jurisdiction over the corporate Defendant in the state of Minnesota?*

MR. CAMBRONNE: *On Jacksonville Kraft, yes, Your Honor.*

THE COURT: What do you base that on?

MR. CAMBRONNE: From what I understand, Your Honor, there was an ongoing business relationship between Edeskuty and this corporation before my clients ever became involved with this corporation, dating back to, say, 1983 or so. There is an ongoing business relationship that apparently was just engaged in by these two parties over the course of a number of years.

THE COURT: Well, an ongoing business relationship doesn't necessarily mean there is personal jurisdiction over—

MR. CAMBRONNE: That's correct, Your Honor. And I guess—

THE COURT: Wait a minute. I am just inquiring as to what facts are there that there was jurisdiction over them in this state?

MR. CAMBRONNE: *I don't mean to say categorically, Your Honor, that there is jurisdiction in this case.* But I do know for a fact that the company, Jacksonville Kraft Paper Company and

the Edeskuty company, had a business relationship, transmitted mail back and forth, apparently did work down in the state of Florida, that would in any way create a question as to whether or not this is an appropriate forum to resolve the case against the corporate Defendant....

October 6, 1987 hearing transcript at 7–9 (emphasis added).

Subsequently, near the end of the hearing, the Court further commented on its jurisdiction over Kraft in statements directed towards Edeskuty's counsel.

THE COURT: I have to believe, from the argument that [Cambronne] made and the answers that he gave to me in my questions, that this Kraft Paper outfit must be pretty much belly up. *I was almost inviting him to bring some sort of motion for lack of personal jurisdiction, just to kind of get it before me and see what his position was.*

He didn't seem interested in it, which indicates to me that if I grant the motion to dismiss these other two Defendants, that you are going to be left with kind of a hollow shell here in Minnesota.

Frankly, in my reading of these briefs and my study of the cases, I don't know that there is jurisdiction over this individual Defendant and Seminole in Minnesota. *And yet, Kraft Paper doesn't even contest jurisdiction over it.*

So if I dismiss the first two Defendants and leave Kraft Paper, that's where we sit with the case. And I don't know what you have at that point....

October 6, 1987 hearing transcript at 23–24 (emphasis added).

At the hearing, the Court orally granted defendant Seminole's motion to dismiss for lack of personal jurisdiction but denied defendant Zion's motion to dismiss pending limited jurisdictional discovery by plaintiff. This discovery was extended from October 1987 until February 1988. During that time, Edeskuty's counsel made repeated references to Kraft's consent to personal jurisdiction [6] and, Kraft never disputed the

6. *See, e.g.,* Plaintiff's Memorandum of Law in     Support of Motion for Sanctions, or in the alter-

point. After the jurisdictional discovery was completed, the Court granted Zion's motion to dismiss and denied Kraft's motion to transfer venue. In its Order, the Court flatly stated "Defendant Kraft concedes jurisdiction over it in Minnesota...." June 20, 1988 Order at 14.

Kraft did not make any motion under Federal Rule of Civil Procedure 60 for relief from that portion of the Order. Nonetheless, when Kraft filed its answer on July 19, 1988, Kraft denied that it had contacts with this jurisdiction sufficient for the exercise of personal jurisdiction. Five months later, Kraft filed this motion to dismiss for lack of personal jurisdiction.

### B. *Analysis of Personal Jurisdiction Issue*

■ Personal jurisdiction involves an individual right which, like other individual rights, can be waived. *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 703, 102 S.Ct. 2099, 2105, 72 L.Ed.2d 492 (1982). A party can abandon or waive its personal jurisdiction defense. *Id.* at 703–04, 102 S.Ct. at 2104–05; *see also, English v. 21st Phoenix Corp.,* 590 F.2d 723, 728 n. 5 (8th Cir.) ("Unlike subject-matter jurisdiction, in personam jurisdiction may be obtained by actions of a party amounting to a waiver...."), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979).

■ The Court finds that the statements by Kraft's counsel at the October 6, 1987 hearing were a consent to jurisdiction over Kraft. The Court asked Kraft's counsel, "Are you saying that you believe that there is personal jurisdiction over the corporate Defendant [Kraft] in the state of Minnesota?" Counsel's answer was simply, "On Jacksonville Kraft, yes, Your Honor." When counsel later said that he did not mean to "say categorically" that there was jurisdiction over Kraft, he seemed to be acknowledging that there was some basis for disputing jurisdiction with the implica-

tion that, nonetheless, Kraft had decided not to contest the issue. Kraft never took issue with the Court's interpretation of counsel's statements, despite the fact that the subsequent Order made clear that the Court understood Kraft to have conceded personal jurisdiction.

Even if Kraft were understood to have preserved its defense at the October 6, 1987 hearing, Kraft's failure to raise the personal jurisdiction issue until this point in the litigation amounts to an abandonment of its defense. *See, e.g., Vozeh v. Good Samaritan Hospital,* 84 F.R.D. 143, 144 (S.D.N.Y.1979) (Defendant contested personal jurisdiction in pretrial conference but, despite fact counsel was then admonished by court for failing to raise issue sooner, did not move to dismiss until more than one year after conference. Defendant held to have abandoned personal jurisdiction defense.).

Kraft's motion to dismiss for lack of personal jurisdiction will therefore be denied.

### II. *Motion to Dismiss for Improper Venue*

■ Kraft moves to dismiss for improper venue under 28 U.S.C. § 1391(b) which provides that civil actions "not founded solely on diversity of citizenship" may be brought only in the judicial district where all the defendants reside or in the district where the claim arose. The complaint included a count against Zion for violation of RICO 18 U.S.C. §§ 1961, *et seq.* Zion, however, was dismissed from the case on June 20, 1988. The only claims remaining are state law claims against Kraft. Subject-matter jurisdiction is therefore based solely on diversity of citizenship. Hence, venue is determined by 28 U.S.C. § 1391(a), which provides:

A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in the judicial dis-

native, to Compel Discovery at 1 n. 2. ("[K]raft did not dispute personal jurisdiction in Minnesota.") and October 7, 1987 Letter from Linda L. Holstein to Judge Harry H. MacLaughlin

("Kraft, which does not, and by its own admission in open court, cannot contest the validity of jurisdiction in this Court.").

trict where all plaintiffs or all defendants reside, or in which the claim arose.

Venue in the District of Minnesota is proper because the plaintiff resides in this district. Kraft's motion to dismiss for improper venue will therefore be denied.

### III. *Edeskuty's Request for Sanctions*

Edeskuty claims that Kraft's motion for dismissal was motivated by bad faith and requests sanctions pursuant to 28 U.S.C. § 1927. That statute provides for an award of costs, expenses and fees against an attorney who multiplies the proceedings in the case "unreasonably and vexatiously." The motion will be denied. The record does not reflect bad faith on the part of Kraft's counsel and no award of sanctions is justified.

### IV. *Edeskuty's Motion for Partial Summary Judgment*

A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). In making this determination, the Court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences that can be drawn from the facts. *AgriStor Leasing,* 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial.

*Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988).

Edeskuty seeks summary judgment on both its breach of contract and *quantum meruit* claims. In support of its motion, Edeskuty has presented the following evidence.

#### 1. *The Edeskuty Affidavit*

Robert V. Edeskuty was Edeskuty's principal contact with Kraft. Plaintiff's Exhibit A, Edeskuty Aff. at par. 2. His affidavit states that in the normal course of business between Edeskuty and Kraft, the officers and agents of Kraft orally authorized Edeskuty to undertake assignments. *Id.* at par. 5. Upon completion of the work, Edeskuty would subsequently send Kraft an invoice for the work performed and Kraft would pay Edeskuty without requiring any written authorization to be produced. *Id.* at par. 7.

Attached as an exhibit to Edeskuty's affidavit is an outline of the work Edeskuty performed for Kraft. *Id.* at par. 6 and attachment. For the year 1985, the outline specifies what work was performed, when it was performed, who authorized its performance, and the amount billed. *Id.* at attachment at 2–7. The affidavit also states that Edeskuty's work always met or exceeded industry standards and that Kraft never complained about the quality of the work. *Id.* at par. 8–9.

#### 2. *The Wise Affidavit*

Edeskuty also submits the affidavit of Evan M. Wise, pulp and power manager for Kraft from January 1, 1984 until approximately December 1, 1985. Plaintiff's Exhibit G, Wise Aff. at par. 3. Wise states that the nature of the work performed by Edeskuty for Kraft required flexibility and quick action, so that it was Kraft's practice to authorize work by Edeskuty without issuing a formal purchase order. *Id.* at par. 6–7. Wise states that he had the authority to authorize work on behalf of Kraft. *Id.* at par. 8. Attached to the affidavit is a

copy of the outline of the work performed by Edeskuty which is exactly the same as the outline attached to the Edeskuty affidavit except that it does not specify who authorized each project in 1985. Wise states in his affidavit that the work described in the outline was, to the best of his knowledge, performed. *Id.* at par. 9–10. Wise also states that he authorized the work described on the outline "as amended." *Id.* at par. 8. The outline is amended by handwritten notations, presumably by Wise, which indicate those projects authorized by persons other than himself. *Id.* at attachment at 2–6. Wise specifies who authorized each of these projects. *Id.* Wise's notes are consistent with Robert Edeskuty's statements about who authorized Edeskuty's work.

### 3. *Invoices and Summaries of Accounts*

In addition, Edeskuty presents the invoices it sent to Kraft covering the period from March 14, 1985 until December 4, 1985. Plaintiff's Exhibits K, N. With the invoices, Edeskuty includes documents titled "Summary of Invoices and Amounts Due," which were sent to Kraft periodically to inform it of the total amount outstanding and urge payment. *Id.* Edeskuty's records indicate that it received five payments from Kraft between April and September of 1985.

### 4. *Zion's Admission that the Work was Performed*

At his deposition, Abraham Zion stated that the company never took the position that the work Edeskuty claimed to have done was not done. Plaintiff's Exhibit J, Zion Dep. at 97.

### 5. *Williams Letter of Recommendation*

Edeskuty also presents a letter written by Robert H. Williams, vice president of Kraft in which Williams offers to recommend Edeskuty's services to other industrial, heavy energy users. The letter states that Edeskuty had provided Kraft with consulting services since November 1983 and provides a brief description of the work done by Edeskuty. Plaintiff's Exhibit O, June 17, 1986 Letter from Robert H. Williams to Joseph and Robert Edeskuty.

### 6. *Zion's January 1986 Requests*

Finally, Edeskuty presents two letters from Robert V. Edeskuty to Abraham Zion dated January 28, 1986 and February 6, 1986 in which Edeskuty responded to telephone inquiries about work to be done on the boilers in the Jacksonville complex. Plaintiff's Exhibits M, N.

On the basis of this evidence, Edeskuty argues for summary judgment on its breach of contract and *quantum meruit* claims. Edeskuty argues that the evidence establishes that: (1) Edeskuty performed engineering services pursuant to the oral request of Kraft's managers and agents; (2) Kraft's principals were aware of the services furnished by Edeskuty; (3) Kraft's principals ratified the oral authorizations of Kraft's managers and agents by making partial payments for Edeskuty's services, by retaining Edeskuty's invoices without objection, and by continuing to contact Edeskuty for advice after the completion of the services at issue; and (4) Kraft obtained Edeskuty's services without making full payment for those services.

In order to be entitled to summary judgment for breach of contract, Edeskuty must establish the existence of a contract and a breach by evidence "so one-sided" that Edeskuty must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). Minnesota law recognizes express contracts formed by a writing, an oral agreement, conduct or through a combination of means. *McArdle v. Williams*, 193 Minn. 433, 258 N.W. 818 (1935); *Georgens v. FDIC*, 406 N.W.2d 95 (Minn.Ct.App.1987). A fact finder may infer the existence of a contract from the circumstances and conduct of the parties. *Bergstedt, Wahlberg, Berquist Assoc., Inc. v. Rothchild*, 302 Minn. 476, 225 N.W.2d 261, 263 (1975); *Gryc v. Lewis*, 410 N.W.2d 888, 891 (Minn.Ct.App.1987).

Kraft does not dispute that Edeskuty, in response to oral requests from officers and agents of Kraft, would perform services at the Jacksonville complex and later bill Kraft for those services. After March 14, 1985, Kraft only made partial payments on those bills but Kraft has produced no evidence suggesting that it ever required Edeskuty to provide written authorization for work performed prior to issuing payment. Likewise, Kraft accepted the services provided and no evidence is offered suggesting that Kraft ever objected to the amount billed or the quality of the work performed. Zion Dep. at 120, 147.

Nevertheless, Kraft claims that four factual disputes preclude summary judgment on Edeskuty's contract claim. Kraft claims that (1) Edeskuty has failed to show that it was properly authorized to perform all of the work for which payment is claimed; (2) Edeskuty has failed to show that the work was done properly; (3) a dispute exists about how much Kraft paid Edeskuty; and (4) a dispute exists about how much Kraft is entitled in damages for work not properly performed by Edeskuty.

The first of Kraft's claims is the most important. Zion testified at his deposition that the only officer with the power to orally contract for services was Kraft's president. Defendant's Exhibit 4, Affidavit of Abraham Zion at par. 4 and Defendant's Exhibit 5, Zion Dep. at 97–98. From the time of Zion's purchase of Kraft in March 1985 until April 22, 1985, the president was Ben Westby. *Id.* at 134. From April 22, 1985 until October 1985, it was Edward Sadowsky. *Id.* at 86–88, 139, 144. After Sadowsky left, Zion acted as president for the company. Zion Dep. at 92.

■ Edeskuty does not offer evidence that any of the work completed after March 14, 1985 was directly authorized by Westby, Sadowsky or Zion. However, the doctrine of accounts stated allows Edeskuty to avoid the necessity of submitting proof that each of the officers and agents of Kraft had either actual or apparent au-

thority to contract with Edeskuty on behalf of Kraft. An account stated is a stated sum which the debtor has agreed to be an accurate computation of an amount due the creditor. *American Druggists Insurance v. Thompson Lumber Co.*, 349 N.W.2d 569, 573 (Minn.Ct.App.1984); Restatement of Contracts 2d § 282(1). An account stated constitutes *prima facie* evidence of the liability of the debtor. *Erickson v. General United Life Insurance Co.*, 256 N.W.2d 255, 259 (Minn.1977). The retention of a statement of account without objection for more than a reasonable period of time will operate to create an account stated. *American Druggists Insurance*, 349 N.W. 2d at 573; Restatement of Contracts 2d § 282(1); 15 *Williston on Contracts* § 1863 (3d ed. 1972).

Edeskuty regularly invoiced Kraft for the services provided and submitted copies of these forms to Kraft's principals.[7] When Edeskuty failed to receive payment by January 1986, it secured a mechanics lien for an amount of $83,110.64. Complaint, Exhibit E. Kraft did not object to invoices or the liens or in any way dispute its debt to Edeskuty until January 1987. Zion Dep. at 120, 147. Kraft's failure to dispute the amounts due for more than a year establishes a *prima facie* case for recovery on an account stated.

■ Kraft next claims that a factual dispute exists over whether Edeskuty properly performed its work for Kraft. In support, Kraft argues that "some of the work" Edeskuty was performing was supposed to bring the Jacksonville boilers within pollution control standards. Defendant's Memorandum at 7. Those boilers never did meet the relevant standards and ultimately fines of $25,000 a day were levied against the plant for pollution control violations.

All the evidence in the record, however, indicates that Edeskuty's work was competent and professional. Plaintiff's Exhibit A, Edeskuty Aff. at par. 8 and Plaintiff's Exhibit O, June 17, 1986 Letter from Robert H. Williams to Joseph and Robert Edes-

---

7. The invoices were directed, at various times, to Ben Westby, Ron Caravano, Evan Wise, and Robert Zion. Abraham Zion admitted in his deposition that he had seen the invoices. Plaintiff's Exhibit J, Zion Dep. at 120, 147.

kuty. Kraft has not introduced any affidavit or document indicating that any of Edeskuty's work was improperly performed. Kraft has not met its burden, as described in *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988), of setting forth specific facts showing that there is a genuine issue for trial on this point.

Kraft also claims that a factual dispute exists about how much Edeskuty was paid. Kraft's argument is based on the fact that Edeskuty's summary of accounts apparently does not include a payment of $15,000 received from Kraft on August 23, 1985. Defendant's Exhibit 8, August 26, 1985 Letter from Neil A. Sticha, Edeskuty Financial Manager, to Kraft. Edeskuty explains that the August 23, 1985 payment was incorrectly recorded on Edeskuty's books as having been received on September 23, 1985. Supplemental Affidavit of Robert Von Edeskuty at par. 14–16. The Court accepts Edeskuty's explanation of this discrepancy in its records. Edeskuty has provided sworn statements of the amount outstanding and copies of all the relevant invoices. Tellingly, Kraft fails to produce its own statement of account in order to demonstrate that Kraft has paid more to Edeskuty than Edeskuty's records reflect. The Court find that there is no genuine issue of fact on the amount due Edeskuty.

Finally, Kraft claims that a dispute exists concerning whether Kraft is entitled to damages from Edeskuty. Kraft's claim is based on an assertion that Edeskuty was responsible for Kraft's failure to meet pollution control standards. As mentioned above, however, Kraft does not present any specific evidence that Edeskuty's work was inadequate. Likewise, Kraft does not provide any evidence that Edeskuty was responsible for Kraft's failure to meet pollution control standards. Thus, Kraft fails to establish a genuine issue for trial. Moreover, Kraft is required by Fed.R.Civ. P. 8(c) to include a claim for set-off in its answer. *See, Worster Motor Lines, Inc. v. Lombardo*, 531 F.Supp. 106, 110 (W.D.Pa.

1982) (claim for set-off is an affirmative defense for purposes of rule 8(c)). Kraft's answer does not include a claim for set-off against Edeskuty.

Thus, none of the factual disputes asserted by Kraft can preclude summary judgment. The Court will grant summary judgment on Edeskuty's claim for breach of contract. Given this result, Edeskuty's claims in *quantum meruit* need not be discussed.

Accordingly, based on the foregoing, and upon all the files, records, proceedings and arguments of counsel,

IT IS ORDERED that:

1. Kraft's motion to dismiss for lack of personal jurisdiction is denied;

2. Kraft's motion to dismiss for improper venue is denied;

3. Edeskuty's request for costs and attorneys' fees under 28 U.S.C. § 1929 is denied; and

4. Edeskuty's motion for partial summary judgment on its claim for breach of contract is granted in the amount of $83,-065.64, together with contract interest at 18 percent per annum.